George **H. BROWN** et al., Plaintiffs,

v.

**TAHOE REGIONAL PLANNING AGENCY, a political subdivision of the States of Nevada and California, Defendants.**

**Civ. No. R–2773.**

United States District Court, D. Nevada.

May 23, 1973.

Charles E. Springer, Reno, Nev., for plaintiffs.

Richard R. Hanna, South Lake Tahoe, Cal., for defendants.

### ORDER DENYING MOTION TO DISMISS FIRST AMENDED COMPLAINT

BRUCE R. THOMPSON, District Judge.

This action was instituted by plaintiffs to obtain a declaration of rights with respect to the impact of the Land Use Ordinance adopted February 10, 1972 by the Tahoe Regional Planning Agency. The latter is a political subdivision of the States of California and Nevada created pursuant to an interstate compact, the Tahoe Regional Planning Compact, which was adopted and approved by the Congress of the United States. Public Law 91–148, December 18, 1969, 83 Stat. 360.

The action was instituted in the First Judicial District Court of the State of Nevada, in and for the County of Douglas. It was filed as a class action. An order for maintenance of a class action was promptly made by the State Court. The class was defined as "those persons who own or have other interest in real estate or who are lenders, mortgagees or trust beneficiaries in connection with real estate located in Douglas County, Carson City, and Washoe County, Nevada, and in the Lake Tahoe 'Region,' as defined in Article 2 of the Tahoe Regional Planning Compact, NRS 277.190–277.220, inclusive."

Notice of class action was given. Some landowners, responsive to the notice, have filed Requests for Exclusion; others have filed an Entry of Appearance.

The action was removed to this Court and a Motion to Remand has been denied. The jurisdiction of the Court is predicated on 28 U.S.C. § 1331. The case arises under the Constitution and laws of the United States, involving the interpretation and application of Public Law 91–148 and of the Fifth Amendment to the Constitution of the United States. The file is deficient with respect to an allegation of the jurisdictional amount, but the Court can take judicial notice that the amount in controversy easily exceeds the sum or value of $10,000, exclusive of interest and costs, so the pleading deficiency is of no moment. The class action is one where all members of the class unite to enforce a single title or right in which they have a common and individ-

ual interest. Their claims can be aggregated. Pinel v. Pinel, 240 U.S. 594, 36 S.Ct. 416, 60 L.Ed. 817 (1916); Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969).

Plaintiffs' prime contention is that the land use ordinance, as applied to their lands in the Lake Tahoe Basin, is so restrictive as to make the land unavailable to plaintiffs for any personal, private beneficial use and that the Ordinance is, in effect, a dedication of the lands to the public for use as parks, forest or general recreational areas.

The two most restrictive classifications of land use provided by the Ordinance are (1) General Forest District,[1] and (2) Recreation District.[2]

Section 9.14, referred to in sections 7.20 and 7.30, is a limited "grandfather clause."[3]

The other land use districts set up by the Ordinance for the protection of Lake Tahoe and its environment are much more similar in regulatory restrictions to the urban zoning ordinances with which we are all familiar. These classifications are: Rural Estate Low Density Residential, Medium Den-

---

1. "*General Forest District*
   "*7.21 Specific Purposes:*
   "(1) To preserve outdoor recreational opportunities.
   "(2) To permit the growing and harvesting of timber, agricultural activities, and extraction of resources.
   "*7.22 Permitted Uses:*
   None but the following uses, or those allowed pursuant to an administrative permit issued in accordance with Section 8.33, which are found to be appropriate and similar in nature, shall be permitted:
   (1) *Residential:* None, except as provided in Section 9.14.
   (2) *Tourist Residential:* None
   (3) *Outdoor Recreation:*
     (a) Hiking trails and undeveloped campgrounds;
     (b) Developed campgrounds;
     (c) Riding trails, pack stations, corrals, stables, and accessory facilities;
     (d) Organized recreation camps;
     (e) Skiing facilities.
   (4) *Resource Management and Agriculture:*
     (a) Growing and harvesting timber and other forest products;
     (b) Forest products removal;
     (c) Forest management program;
     (d) Grazing livestock;
     (e) Fish and wildlife management programs;
     (f) Fire lookouts.
   (5) *Public and Quasi-Public:*
     (a) Major roads and water crossing structures;
     (b) Radio, telephone and television broadcast and relay stations;
     (c) Overhead and underground utilities;
     (d) Historic sites;
     (e) Fire protection facilities;
     (f) Water storage tanks and reservoirs;
     (g) Sewage lift stations;
     (h) Electrical substations.
   (6) *Commercial:* None"

2. "*Recreation District*
   "*7.31 Specific Purposes:*
   (1) To assure adequate public opportunity for outdoor recreation, including ski facilities, boating, day use areas, and access to public and quasi-public beaches in urban core areas and settlement node areas.
   "*7.32 Permitted Uses:*
   None but the following uses, or those allowed pursuant to an administrative permit issued in accordance with Section 8.33, which are found to be appropriate and similar in nature, shall be permitted.
   (1) *Residential:* None, except as provided in Section 9.14.
   (2) *Tourist Residential:* None
   (3) *Outdoor Recreation:*
     (a) All those permitted in the General Forest zone,
     (b) Day Use Areas,
     (c) Outdoor Recreation Concessions.
   (4) *Resource Management and Agriculture:*
     (a) Forest Management Programs.
   (5) *Public and Quasi-Public:*
     (a) All those permitted in the General Forest zone,
     (b) Educational Facilities, Avocational.
   (6) *Commercial:* None"

3. "*9.14 Single Family Houses on Pre-Existing Lots and Parcels in General Forest and Recreation Districts*
   One single family house may be constructed on any existing lot or parcel of record as of February 10, 1972 that is located in a General Forest District or a Recreation District, *provided, however,* that this Section shall not apply to lots in residential subdivisions where the final map of such subdivision was approved and filed for record more than five (5) years prior to February 10, 1972 and there has been no construction of roads, sewers, or other substantial facilities serving the subdivision, or the posting of performance bonds assuring such construction, prior to February 10, 1972."

sity Residential, High Density Residential, Tourist Commercial, General Commercial, Public Service and Conservation Reserve.

While plaintiffs have not specifically so alleged, it is a fair inference from the Complaint that the lands owned by them have been classified in the General Forest District or the Recreation District. In any event, it is reasonable and practical to limit the class to landowners in the Lake Tahoe Basin whose properties have been included in one of these two districts. The class action determination heretofore made shall be amended accordingly. Rule 23(c)(1), Federal Rules of Civil Procedure.

The prayer of plaintiffs' First Amended Complaint is as follows:

"WHEREFORE, Plaintiffs pray for judgment as follows:

"1. Declaring that the land use restrictions imposed on plaintiffs' properties by the Land Use Ordinance constitutes a 'taking' of such properties for public use;

"2. Declaring that such ordinance is an invalid exercise of authority beyond the legitimate police power and is unenforceable;

"3. In the alternative, declaring that public necessity warrants the restrictions imposed by the ordinance, but that the 'taking' of plaintiffs' properties thereby constitutes inverse condemnation of such properties for which the plaintiffs are entitled to be justly compensated.

"4. Awarding plaintiffs such compensation as the proofs show to be just.

"5. For such other and further relief as to the Court may appear just and proper."

Relief is sought in the alternative. The action may be treated as a complaint for damages for a taking of property for public use by an agency of the States of California and Nevada. The defendant here, the Tahoe Regional Planning Agency, does not, however, under the Tahoe Regional Planning Compact which is, in effect, the constitution of the Agency, enjoy any power to tax. Article VII—Finances,[4] of the Compact makes the Agency dependent on the Counties, together with fees,

---

4. *"Article VII. Finances.*

"(a) Except as provided in paragraph (e), on or before December 30 of each calendar year the agency shall establish the amount of money necessary to support its activities for the next succeeding fiscal year commencing July 1 of the following year. The agency shall apportion not more than $150,000 of this amount among the counties within the region on the same ratio to the total sum required as the full cash valuation of taxable property within the region in each county bears to the total full cash valuation of taxable property within the region. Each county in California shall pay the sum allotted to it by the agency from any funds available therefor and may levy a tax on any taxable property within its boundaries sufficient to pay the amount so allocated to it. Each county in Nevada shall pay such sums from its general fund or from any other moneys available therefor.

"(b) The agency may fix and collect reasonable fees for any services rendered by it.

"(c) The agency shall be strictly accountable to any county in the region for all funds paid by it to the agency and shall be strictly accountable to all participating bodies for all receipts and disbursements.

"(d) The agency is authorized to receive gifts, donations, subventions, grants, and other financial aids and funds.

"(e) As soon as possible after the ratification of this compact, the agency shall estimate the amount of money necessary to support its activities:

"(1) For the remainder of the then-current fiscal year; and

"(2) If the first estimate is made between January 1 and June 30, for the fiscal year beginning on July 1 of that calendar year.

"The agency shall then allot such amount among the several counties, subject to the restriction and in the manner provided in paragraph (a), and each county shall pay such amount.

"(f) The agency shall not obligate itself beyond the moneys due under this article for its support from the several counties for the current fiscal year, plus any moneys on hand or irrevocably pledged to its support from other sources. No obligation contracted by the agency shall bind either of the party states or any political subdivision thereof."

gifts and donations, for operating expenses and specifically excludes the States and their political subdivisions from liability for obligations incurred by the Agency. It is, therefore, questionable whether an effective action for just compensation will lie against this defendant.

This Complaint does, nevertheless, it seems to us, present a proper claim for declaratory relief. The Complaint alleges that claims against the Agency on account of the excessively restrictive land use classifications have been rejected. There is a substantial case or controversy made by the enactment and projected enforcement of the Land Use Ordinance. The two serious questions are (1) are the land use classifications of General Forest District and Recreation District so arbitrary and prohibitive under all the facts and circumstances as to be an invalid exercise of the police power, and (2), if the two classifications are a reasonable and proper exercise of the police power for the protection of the Lake Tahoe Basin, its ecology and environment, are they nevertheless so destructive of the value of the properties embraced in these Districts as to constitute a taking of the property for public use? United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); United States v. Kansas City Life Insurance Co., 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950); Symonds v. Bucklin, 197 F. Supp. 682 (D.C.Md.1961).

■ At first blush, this Court entertained the view that the Agencies' land use classifications were either reasonable and valid or unreasonable, arbitrary and invalid, and that, regardless of the final conclusion, there could be no claim for compensation. Further study, however, with the assistance of briefs of counsel, has led to acceptance of an alternative, that is, that public welfare and necessity may reasonably require exceptionally restrictive land use classification for the protection of the public interests in the Lake Tahoe Basin, but that such valid regulations may nevertheless constitute a taking of private property for public use entitling the owner to just compensation. In United States v. Central Eureka Mining Co., 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1288 (1958), the Court was concerned with the validity of wartime regulations prohibiting the operation of gold mines. While it concluded that under all the circumstances the regulations did not constitute a taking, the Court laid out the following principles:

"Thus the WPB made a reasoned decision that, under existing circumstances, the Nation's need was such that the unrestricted use of mining equipment and manpower in gold mines was so wasteful of wartime resources that it must be temporarily suspended. Traditionally, we have treated the issue as to whether a particular governmental restriction amounted to a constitutional taking as being a question properly turning upon the particular circumstances of each case. See Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 416 [, 43 S. Ct. 158, 160, 67 L.Ed. 322.] In doing so, we have recognized that action in the form of regulation can so diminish the value of property as to constitute a taking. E. g., United States v. Kansas City Life Ins. Co., 339 U.S. 799, [70 S.Ct. 885, 94 L. Ed. 1277;] United States v. Causby, 328 U.S. 256, [66 S.Ct. 1062, 90 L. Ed. 1206.] However, the mere fact that the regulation deprives the property owner of the most profitable use of his property is not necessarily enough to establish the owner's right to compensation. See Mugler v. [State of] Kansas, 123 U.S. 623, 664, 668, 669 [, 8 S.Ct. 273, 298, 300, 301, 31 L.Ed. 205.] In the context of war, we have been reluctant to find that degree of regulation which, without saying so, requires compensation to be paid for resulting losses of income. E. g., Hamilton v. Kentucky Distilleries [& Warehouse] Co., 251 U.S. [146, 40 S.Ct. 106, 64 L.Ed. 194;]

Jacob Ruppert [, Inc.,] v. Caffey, 251 U.S. 264, [40 S.Ct. 141, 64 L.Ed. 260;] Bowles v. Willingham, 321 U.S. 503 [64 S.Ct. 641, 88 L.Ed. 892]; and see United States v. Caltex, Inc., 344 U.S. 149 [73 S.Ct. 200, 97 L.Ed. 157]. The reasons are plain. War, particularly in modern times, demands the strict regulation of nearly all resources. It makes demands which otherwise would be insufferable. But wartime economic restrictions, temporary in character, are insignificant when compared to the widespread uncompensated loss of life and freedom of action which war traditionally demands."

These are problems that should be met head-on and decided as promptly as possible for the benefit of the public as well as the plaintiffs. In view of modern concern with environmental protection and the proliferation of statutes, rules and regulations for the control and avoidance of pollution of land, air and water, and the protection of the beauty and quality of the natural resources with which we have been endowed by our Creator, the problems will be recurring over and over again. Under the principles to which we have alluded, a decision cannot be made on the pleadings. All the facts and circumstances impelling the enactment of the Land Use Ordnance and justifying the land use classifications must be ventilated and explored before a reasoned conclusion may be reached. The impact of the Ordinance upon the use and value of the plaintiffs' lands is also an issue requiring consideration of evidence for its solution.

Defendant cogently argues that plaintiffs' Complaint must fall because they have not exhausted administrative remedies provided in the Land Use Ordinance.

The administrative procedure referred to and provided by the compact is found in Article V, Planning, which states, in part:

"If a request is made for the amendment of the regional plan by . . . (2) The owner or lessee of real prop-erty which would be affected by such amendment, the governing body shall complete its action on such amendment within 60 days after such request is delivered to the agency."

The Land Use Ordinance also provides administrative remedies available to the plaintiffs for relief from unduly restrictive provisions. Among these are the provisions of section 8.25 permitting additional land alterations by issuance of an administrative permit upon a showing by the applicant that:

"(1) the land of the applicant seeking the permit exhibits the characteristics generally existent in a Land Capability District other than the one in which it has been located, that the limitations of such other District are therefore properly applicable to such land, and that the proposed excess land coverage will not cause substantial harmful environmental consequences on the land of the applicant or on other lands or waters; or

"(2) the applicant's proposed development, as designed and located, will not cause the detrimental environmental consequences on the land of the applicant, or on other lands or waters, that were the basis of the classification of the applicant's land in the applicable Land Capability District in the first instance."

In addition, section 5.50 provides administrative relief in proper cases and upon a proper showing, as follows:

"5.50 The Land Capability Map identifies the capacities of the lands in the Region to withstand disturbance without risk of substantial harmful consequences occurring. These disturbances are expressed in this Ordinance in terms of land coverage. Specific permitted amounts of land coverage are established for each land capability district. These specified amounts are intended as baseline standards only. They are subject to variation in any particular case upon a demonstration by an applicant, a

local government, or the Agency, based upon detailed site investigation, that the land in question does not share the characteristics generally existent in the land capability district in which the land is located, or upon a similar demonstration by an applicant that a proposed development, as specifically designed and located, including mechanical and other means to moderate harmful consequences, will not cause the harmful classification of the land in question in the district in which it is located. Any permitted variation in land coverage shall be subject to review by the Agency, as provided in Section 4.32."

Also, section 8.28 provides for additional land coverage by the granting of variances in proper cases.

Section 8.34 provides for variances from the terms of the use regulations of the ordinance.

In confession and avoidance, plaintiffs have pleaded:

"That in view of the public position taken by the Defendant, TRPA, with regard to the ecological fragility of the properties herein involved and the resultant need to prohibit or severely restrict development, the expenditure of substantial sums of money by the plaintiffs for engineering and architectural work which would be necessary to apply for subdivision approval or building permits would be an expensive exercise in futility, and therefore exhaustion of such remedies is not required before seeking judicial resolution of the controversy between the plaintiffs and the TRPA."

This allegation may be true; at least it presents an issue for determination.

■ Unquestionably, with respect to most zoning regulations, the Courts have held that remedies within the Ordinance must be exhausted before recourse may be sought in the Courts. Igna v. City of Baldwin Park, 9 Cal. App.3d 909, 88 Cal.Rptr. 581 (1970);

Coronet Homes v. McKenzie, 84 Nev. 250, 439 P.2d 219 (1968); Eagle Thrifty v. Hunter Lake P. T. A., 85 Nev. 162, 451 P.2d 713 (1969). With respect to the less restrictive classifications of the Land Use Ordinance of the Tahoe Regional Planning Agency, we see the requirement of exhaustion of the remedies within the Ordinance as being fully applicable.

That, however, is not the situation of these plaintiffs. Their contention is that regardless of the variance procedures and provisions for change of land uses classifications, the total impact of the regulations as a whole, including the remedies within the Ordinance, has been substantially to destroy the value of their properties. This is an issue that plaintiffs are entitled to present for judicial determination under the law as we have found it. As public welfare and necessity dictate more and more restrictions upon the uses and abuses of private exploitation of private property, decisions will have to be made whether the impact of the regulations constitutes *damnum absque injuria* or whether just compensation should be forthcoming. The issue is specifically evident in the present case in view of plaintiffs' allegation that the realistic effect of the classification of their lands in the Lake Tahoe Basin has been a dedication of their properties to public use.

In consideration of the premises, it hereby is ordered:

1. The motion to dismiss the First Amended Complaint is denied.

2. Defendant shall have twenty (20) days to serve and file an Answer.

3. The class determination heretofore made is amended to limit the class represented by plaintiffs to owners of interests of land in the Lake Tahoe Basin in the State of Nevada whose properties lie within the General Forest District or the Recreation District established by the Tahoe Regional Planning Agency.