Henry W. Lengyel, J.
Claimant is a subsidiary of Horizon Corporation, a large-scale land developer, and is the owner in fee of a tract of land comprising approximately 24,000 acres in the Town of Colton, St. Lawrence County, New York. The *620 parcel is situated within the "blue line” of the Adirondack Park. It was purchased by Horizon Adirondack Corporation for the purpose of constructing thereon an extensive housing and recreational development. This property, together with all other land situated within the Adirondack Park, is subject to the Adirondack Park Agency Act (Executive Law, § 800, et seq., hereinafter the "act”), and to the jurisdiction of the Adirondack Park Agency (hereinafter "APA”) created thereby. In 1973 the act was amended to provide for a comprehensive and extensive system of land use controls applicable to privately-owned land within the park. (L 1973, ch 348, § 1.) Alleging that chapter 348 constitutes a "taking” of its property, the claimant filed the present claim on December 11, 1974. The State has moved to dismiss on the grounds that the court lacks jurisdiction of the subject matter and the claim fails to state a cause of action.
Beginning in 1968 with the Temporary Study Commission on the Future of the Adirondacks, the State and various of its agencies and commissions have undertaken, with some degree of local input, the task of developing a program of regional land use control within the Adirondack Park. The APA was formed in 1971, and was given the responsibility for formulation of a land use and development plan and recommendations for implementation. (L 1971, ch 706, § 1.) This process culminated in 1973 with the adoption of chapter 348, referred to above. By this chapter the act was substantially amended, and the system of regional land use controls which are the subject of this litigation was enacted.
The restrictions imposed by the amendment may be summarized as follows. First, the Legislature formally adopted the "Adirondack park land use and development plan” prepared by the APA, as a guide to development of private lands within the park. (Executive Law, § 805, subd 1, par a.) An official land use map attached to the plan delineates the boundaries of land use areas throughout such private lands. Within 20 days after the enactment of chapter 348, the APA was required to file the official map at its headquarters, file a certified copy thereof with the Secretary of State, and file reasonable facsimiles thereof with the Adirondack Park Local Government Review Board and with the clerk of each county and local government within the park. (Executive Law, § 805, subd 2b.)
Chapter 348 provides that "The official Adirondack park land use and development plán map shall have the land use *621 planning and regulatory effect authorized under this article.” (Executive Law, § 805, subd 2, par a.) The plan map classifies land within the park into six types of land use area: hamlet, moderate intensity use, low intensity use, rural use, resource management, and industrial use areas. With respect to each land use classification, chapter 348 sets forth a "character description”, a statement of the purposes, policies, and objectives to be achieved in the area, intensity guidelines, and a classification of compatible uses including lists of "primary” and "secondary” uses. (Executive Law, § 805.) In this manner, land use and density are regulated. It should be noted, however, that the drafters intended to provide a greater degree of flexibility of control and administration than is present in more traditional zoning ordinances. As stated in the memorandum of the State Executive Department: "No uses would be prohibited by the Plan per se: where no approved local land use program exists, those not included as compatible uses for any land use area may be approved by the Agency upon a specific showing of compatibility. Where approved local land use programs exist, such programs would determine which uses were allowable or prohibited.” (1973 McKinney’s Session Laws of NY, pp 2201, 2203.) The former counsel of the APA has written "In fact, the land area concepts employed in the plan are less designed to segregate uses than they are designed to control density of development, and no uses are flatly outlawed anywhere. The Plan speaks in terms only of 'compatible uses’.” (Davis, Land Use Control and Environmental Protection in the Adirondacks, 47 NYS Bar J 189, 220.) The intensity requirements are approximations and are not absolute. For example, the "guideline” for intensity of development of land located in any rural use area provides that development "should not exceed approximately seventy-five principal buildings per square mile”. (Executive Law, § 805 subd 3f(3) [emphasis added].) In resource management areas, the guideline is 15 principal buildings per square mile. (Executive Law, § 805, subd 3, par g, cl [3].) Rather than mandating minimum single-family lot sizes, these provisions would seem tó permit clustering of structures, particularly in the case of large-scale developments.
In addition to adoption of the plan and map, chapter 348 imposes restrictions on use, development, and subdivision of lands along shorelines. These restrictions include controls on lot width, setback, clearing of vegetation, and shoreline front *622 age. Clustering of structures is encouraged. (Executive Law, § 806.)
Finally, of significance to the claim herein, chapter 348 provides for an application, review" and approval process for certain types of land development, designated as "class A or class B regional projects”. Class A and B regional projects are defined separately for each land use classification. In general, regional projects are designated as such on the basis of (1) location within a "critical environmental area” (such as a wetland), (2) type of use (a factor apparently related to the nature or character of the use and its impact on the area), and (3) size (also related to impact). (Executive Law, §§ 808-810; Davis, 47 NYS Bar J, 189, 221-222.) As the land use classifications become more restrictive, more types of development and developments of lesser intensity are brought within the ambit of the regional project approval process. For example, in rural use areas a subdivision involving 20 or more residential lots is designated as a class A regional project; whereas, in the more restrictive resource management areas all subdivisions of land involving two or more lots are designated as class A regional projects. The lists of uses constituting class A and B regional projects are lengthy and detailed. (Executive Law, § 810.)
In addition to the agency’s review powers over regional projects, the provisions of the act and certain rules and regulations or orders adopted pursuant thereto were enforceable by fine or imprisonment. The Attorney-General was granted powers to institute any appropriate action or proceeding to enforce such provisions, regulations or orders, or to prevent, restrain, enjoin, correct or abate any violation thereof. (L 1973, ch 348, § 1; Executive Law, § 813.) A recent amendment substituted civil penalties for the criminal sanctions, but the equitable enforcement powers of the Attorney-General were retained. (L 1976, ch 898, § 1.)
The land owned by the claimant is located within APA designated rural use and resource management areas, and is subject to the strict intensity "guidelines” and use classifications applicable to such areas. The primary effect of these restrictions is to limit the development originally proposed by the claimant for 6,955 dwelling units to a maximum of 1,608 dwelling units. As this is a large-scale development, it is presumably subject to the regional project approval provisions. Due to the imposition of these controls, the claimant asserts that it has been deprived of almost all economic use of its *623 property, and that the controls imposed constitute a "taking”. The legislation is alleged to effect a de facto appropriation, for which just compensation is claimed.
In support of its motion to dismiss, the State contends that "[t]he spirit of the claim, absent legal conclusions, is a constitutional challenge to the validity of Chapter 348 of the Laws of 1973 [Executive Law, § 800, et seq.J. Substantively, the action is purely equitable in nature, the demand for money damages being incidental to the primary equitable thrust.” If such was claimant’s legal posture, I would agree with the State’s contention that the Court of Claims did not have jurisdiction over the subject matter; and, that claimant must initially seek a declaration by a court of general jurisdiction as to whether the act, on its face or as applied, is constitutional or not.
However, claimant does not challenge the constitutionality of the act. In its claim, after reciting a description of its real estate holdings affected by the act, the claimant asserts:
"4. That on May 22, 1973, the State of New York caused to be enacted into law Chapter 348 of the Laws of 1973, entitled the 'Adirondack Park Agency Act’.
"5. That the aforesaid described premises owned by the claimant are located within the geographical area affected and controlled by the aforesaid Chapter 348 of the Laws of 1973.
"6. That by reason of the enactment of the said Chapter 348 of the Laws of 1973, the State of New York has unjustly, illegally and unconstitutionally, and without compensation therefor appropriated an interest in the aforesaid premises owned by the claimant and has substantially lowered the value thereof, all to claimant’s loss and damage in the sum of $36,000,000.00, which said sum is due to the claimant from the State of New York.” Claimant’s position, as developed in its memorandum of law and upon oral argument on the motion herein, is not that the act is unconstitutional but rather that the act is so broad in its scope and its effect on claimant’s property is so devastating, that it actually constitutes a de facto appropriation of claimant’s property for which claimant has unconstitutionally been denied just compensation.
Claimant’s posture relative to the constitutional question is supported by the amicus curiae memorandum of law submitted by counsel for claimants in similar economic straits to the claimant at bar.
*624 Counsel wrote that "while the Plan is unique in many ways, and does give great dominion and control to the State concerning the private lands in the park, the private landowners in the Adirondack Park have not been deprived of the entire value of their property and that therefore the statute is constitutional * * *. [I]t is viewed as absurd to seriously advance in this day and age that a State has not the power to proscribe [sic] the land use plans for large areas within its borders, no matter the severity of such plans or their basis in law.”
Therefore, for the purposes of the motion at bar the constitutionality of the act is not in dispute and is not before this court. The sole question presented is whether a land use regulatory statute, which for the purposes of this motion is assumed to have substantial and severe economic impact upon the market value of claimant’s real property (see Cohn v Lionel Corp. 21 NY2d 559, 562; Kober v Kober, 16 NY2d 191, 193-194; Foley v D’Agostino, 21 AD2d 60, 65), may be considered as being tantamount to a de facto appropriation (eg., a taking in fact) of such property for which just compensation must be awarded. Under the applicable law of this State, I conclude that the question must be answered in the negative.
New York courts have been very specific as to the types of governmental actions that may constitute such a "taking”. In City of Buffalo v Clement Co. (28 NY2d 241), the Court of Appeals discussed the nature of the "taking” requirement in de facto appropriation at great length. The following statements are representative of the court’s reasoning:
"[T]he concept of de facto taking has traditionally been limited to situations involving a direct invasion of the condemnee’s property or a direct legal restraint on its use (Leeds v. State of New York, 20 N. Y. 2d 701, supra; Matter of Keystone Assoc. v. Moerdler, 19 N. Y. 2d 78, supra; Oswego & Syracuse R. R. Co. v. State of New York, 226 N. Y. 351, supra; Forster v. Scott, 136 N. Y. 577, supra), and to hold that there can be a de facto appropriation absent a physical invasion or direct legal restraint would, needless to say, be to do violence to a workable rule of law. It is our view that only the most obvious injustice compels such a result.
* * *
"[I]t is clear that a de facto taking requires a physical entry by the condemnor, a physical ouster of the owner, a legal interference with the physical use, possession or enjoyment of *625 the property or a legal interference with the owner’s power of disposition of the property.
* * *
"[Interferences short of physical invasion of the condemnee’s property may * * * be sufficient to constitute a taking, as it has long been settled that a de facto taking does occur where the property has been the subject of some direct legal restraint on its use (supra). As noted above, direct legal restraint has traditionally embraced only laws which by their own force and effect, deprive owners of property or materially affect its beneficial use and free enjoyment (see, e.g., Matter of Keystone Assoc. v. Moerdler, 19 N. Y. 2d 78, supra; Forster v. Scott, 136 N. Y. 577, supra).”(28 NY2d 241, 253, 255, 256.)
Certainly, the land use restrictions imposed by the act constitute a direct legal restraint upon the economic use of claimant’s property. However, an analysis of the cases and the "direct legal restraint” concept clearly develops that such is not the kind of direct legal restraint which may be equated with appropriations followed by just compensation.
The Appellate Division, Third Department, stated in Keystone Assoc. v State of New York (39 AD2d 176, 177, affd 33 NY2d 843) that "Negative easements created by statute or ordinances (e.g., zoning ordinances) pursuant to the police power are not a compensable taking within the meaning of * * * section 7 of article I (Terrace Hotel Co. v. State of New York, 19 N. Y. 2d 526).” While such is ordinarily the case, the particular governmental action involved must be given careful scrutiny. In Terrace Hotel the Court of Appeals noted thát the State could impose a negative easement (to prohibit the use of property along the Route 17 "Quickway” for outdoor advertising purposes) by the use of either police or eminent domain powers. In finding no right to compensation, that court was concerned not with whether a taking had occurred, but with the fact that the interest taken was not compensable. (19 NY2d 526, 529, supra.) The issue of whether a particular law or regulation constitutes a taking rather than an exercise of the police powers will be determined by the purpose, effect and operation of the law, and not by its appearance. (Forster v Scott, 136 NY 577, 584, supra.)
The meaning of "direct legal restraint” as exemplified in Matter of Keystone Assoc. v Moerdler (19 NY2d 78) and Forster v Scott (136 NY 577, supra), was clarified by the Court of Appeals in Lutheran Church in Amer. v City of New York *626 (35 NY2d 121), which case challenged the constitutionality of the New York City Landmarks Preservation Law. In distinguishing an eminent domain "taking” from an unconstitutional exercise of police power regulation, the court wrote (p 130): "The similarity between Matter of Keystone Assoc. v. Moerdler and Forster v. Scott on the one hand and this case, on the other, is that in all of them title and use remained in the record owner. But free use was so severely restricted as to be confiscatory. The factor common to the Matter of Keystone Assoc, v. Moerdler and Forster v. Scott cases, not found in the instant case, is that in those cases the de facto taking was linked to an avowed taking statute. Here, the Landmarks Law is not such and would not necessarily work such results in all cases. ” (Emphasis added.) The law as applied to the plaintiff, Lutheran Church, was found to be in excess of the permissible limits of zoning power and was stricken. City of Buffalo v Clement Co. (28 NY2d 241, supra), also involved an alleged de facto taking which was linked to an "avowed taking statute”. It should be noted that under subdivision 4 of section 818 of the Executive Law, the act is not only not an "avowed taking statute” but also that it is most avowedly and specifically stated not to be a taking statute. That subsection of the act reads as follows: "Nothing in this article shall be construed to empower the agency to acquire any interest in real property by purchase or condemnation. No right of first refusal or first option to purchase in favor of the agency, the department of environmental conservation or any other state agency shall in any way be created by this article or the land use and development plan.”
In the recent case of French Investing Co. v City of New York (39 NY2d 587), a zoning ordinance which restricted several parcels of midtown Manhattan property to public park use was carefully examined to determine whether it constituted a taking which would require the City of New York to pay just compensation. The court found there had not been an "inverse” taking in eminent domain and sustained the lower court’s finding that the city ordinance was invalid as an unconstitutional exercise of the police power. Chief Judge Breitel, writing for a unanimous court, stated (p 595): "In the present case, while there was a significant diminution in the value of the property, there was no actual appropriation or taking of the parks by title or governmental occupation. The amendment was declared void at Special Term a little over a *627 year after its adoption. There was no physical invasion of the owner’s property; nor was there an assumption by the city of the control or management of the parks. Indeed, the parks served the same function as before the amendment, except that they were now also open to the public. Absent factors of governmental displacement of private ownership, occupation or management, there was no 'taking’ within the meaning of constitutional limitations (see City of Buffalo v. Clements Co., 28 N. Y. 2d 241, 255-257). There was, therefore, no right to compensation as for a taking in eminent domain.”
As noted above, the essence of the claimant’s allegations of "taking” are that the controls imposed by the State are so restrictive that it has become infeasible for the claimant to develop its property as planned or, in fact, to put it to any reasonable economic use. Such are not the type of governmental acts that will constitute a "taking” as that term is used in appropriation law. Rather, these allegations are more consistent with the line of cases exemplified by Pennsylvania Coal Co. v Mahon (260 US 393), in which zoning ordinances and other regulatory statutes have been stricken as unreasonable exercises of the police powers. While these cases sometimes utilize the language of an unconstitutional "taking” of property, a clear distinction must be drawn between such cases and those brought under the theory of de facto appropriation. (French Investing Co. v City of New York, 39 NY2d 587, 593-595, supra.)
Increases and decreases in the value of private property brought about by governmental actions, in the absence of the specific sort of acts that constitute a "taking”, are incidents of ownership and will not constitute a compensable taking. (Dan-forth v United States, 308 US 271; City of Buffalo v Clement Co., 28 NY2d 241, supra; Fisher v City of Syracuse, 78 Misc 2d 124, affd 46 AD2d 216, mot for lv to app den 36 NY2d 642, cert den 423 US 833.)
On its face the act is regulatory in nature. (Executive Law, § 805, subd 2, par a.) Its effect is not aimed specifically or directly at claimant’s property. Rather, its restrictions are generally applied throughout the regulated area, and would not necessarily be considered a "taking” of private property in all cases. This observation supports the conclusion that the act is not an "avowed taking statute”. (Cf. Lutheran Church in Amer. v City of New York, 35 NY2d 121, 130, supra.)
The fact that the official map must be filed in various State *628 and. local governmental offices is not evidence of a "taking” by the State, as asserted, by analogy, by amicus. The filing of land use maps is a common feature of zoning law. For example, local master plans showing, inter alia, zoning districts must be filed in clerks’ offices. (Town Law, § 272-a; General City Law, § 28-a; Village Law, § 7-722.)
As also pointed out by amicus, one of the stated purposes of the act is the protection and enhancement of the State’s forest preserve lands within the park. (Executive Law, § 801.) State forest preserves account for approximately 40% of land area within the park. Nearness to such tracts is one of the bases for classification of a proposed development as a "regional project”. (Executive Law, § 810.) However, the accomplishment of the above purpose does not cause the act to be an appropriative statute. Protection or enhancement of State lands is only one of the several valid policies, purposes, and objectives of the act. (Executive Law, § 801.) Even if this were an impermissible objective, such fact would be grounds for declaring the statute invalid as an improper exercise of police powers, not a taking. (Matter of Eaton v Sweeny; 257 NY 176.)
I am cognizant of a handful of cases in which it has been stated that land use control ordinances and other regulatory laws might constitute a de facto appropriation or inverse condemnation. In Dahl v City of Palo Alto (372 F Supp 647) and Brown v Tahoe Regional Planning Agency (385 F Supp 1128) Federal courts held that allegations that land use control statutes effected inverse condemnations of private property presented questions of fact requiring trial. In Arastra Ltd. Partnership v City of Palo Alto (401 F Supp 962), a zoning ordinance was actually found to constitute an inverse condemnation, requiring transfer of title to the city and compensation to the owner; and, in this State, in the Matter of Charles v Diamond (47 AD2d 426, app dsmd 38 NY2d 852), the Fourth Department held that the petitioner should be granted a trial on the issue of an alleged de facto appropriation arising out of nonapproval of sewer connections to his apartment buildings.
I do not consider these cases to be persuasive or controlling of the claim at bar. The Dahl and Arastra cases both concerned a systematic governmental plan to condemn or otherwise acquire the plaintiffs’ property, in which the enactment of a zoning ordinance was merely the last step. These cases are distinguishable on their facts. No allegations have been *629 made by the claimant herein of such a plan on the part of the State ultimately to acquire title to claimant’s premises; and, in fact, such has been proscribed by the act. (Executive Law, § 818, subd 4.) Furthermore, despite the language of the Brown case, not every claim that a land use control measure constitutes an inverse condemnation necessarily generates a question of fact requiring trial. As previously stated by this court in Keystone Assoc. v State of New York (63 Misc 2d 455, 457): "We do not believe that every unreasonable interference with real property rights caused by legislative statute must be equated with appropriation.” In Matter of Charles v Diamond (47 AD2d 426, supra), the petitioners’ right to damages, if proved, was conditioned upon the unavailability of effective article 78 relief. However, in the claim at bar the unavailability of effective equitable relief has not been established.
Both inverse condemnation and zoning cases have repeatedly considered the various public policy implications of governmental actions. Paramount among these is the balancing of equities that is required when private individuals or entities are called upon to suffer restrictions on the use and enjoyment of their property for the benefit of the greater community. As stated by the Supreme Court in Armstrong v United States (364 US 40, 49): "The Fifth Amendment’s guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.” It is a matter of concern to residents of the Adirondacks — largely an undeveloped, rural, and in parts, wild area — that they are now called upon by the State to restrict the use of their property, in order to preserve and maintain the scenic, natural, and environmental qualities of the region for the benefit of the public.
This, however, is no less than has been required of urban, suburban, and even rural property owners in the context of zoning law. Esthetic, open space, and environmental considerations are valid bases for regulation in the Adirondack context (e.g., Matter of McCormick v Lawrence, 83 Misc 2d 64) as well as in the urban (e.g, Penn Cen. Transp. Co. v City of New York, 50 AD2d 265). The Adirondack Park is a resource of greater than local concern, and has been so declared by the Legislature. (Executive Law, § 801, cf. NY Const, art XIV; and E C L 9-0301.) As such, it is only appropriate that the State, *630 together with the local interests which are also affected, be given some degree of control. (Wambat Realty Corp. v State of New York, 85 Misc 2d 489.) Similar or analogous situations exist with respect to other issues of greater than local concern in which local jurisdictions are incapable or unwilling, for political, fiscal, or other reasons, of taking appropriate action, and State or regional entities (in some cases, the courts) assume a role in the decision making process. (E.g., Berenson v Town of New Castle, 38 NY2d 102 [regional housing needs]; Floyd v New York State Urban Development Corp., 33 NY2d 1 [housing]; Admiral Realty Co. v City of New York, 206 NY 110 [rapid transit].) In this manner, the interests of citizens of other areas of the State, not represented by the local governments within the park, may be given a voice. This is entirely consistent with the democractic principles of our society. Thus, in considering the fairness of the restrictions imposed, the burden of the act upon local owners must be balanced against the broader interests of the region and the State.
If such policy issues are to be evaluated, consideration must also be given to fiscal impact. The restrictions of the act embrace an area of six million acres, an area the size of Vermont, approximately 60% of which is in private ownership. (See Wambat Realty Corp. v State of New York, 85 Misc 2d 489, 494, supra; Memorandum of Hon. Nelson A. Rockefeller, on approving L 1973, ch 348, 1973 McKinney’s Session Laws of NY, p 2342.) An award of damages would have staggering implications upon the State budget and tax system. These implications were not contemplated by either the Legislature or by the voters when chapter 348 was enacted into law. The statements concerning fiscal impact contained in the memorandum of the State Executive Department relative to chapter 348 make no mention of the possibility of State liability for either de facto or de jure appropriation damages. (1973 McKinney’s Session Laws of NY, p 2203.) To quote the Court of Appeals, the people of the State should be "given the power of deciding whether or not they wish to obtain the benefit despite the ultimate economic cost.” French Investing Co. v City of New York, 39 NY2d 587, 597, supra.)
Of course, if a taking in the sense of eminent domain were present, the State and Federal Constitutions would require that just compensation be rendered (City of Buffalo v Clement Co., 28 NY2d 241, supra), and this court would not — and, indeed, could not — be influenced in computing the extent of *631 damages by the fiscal implications of the present claim and other pending and potential claims under the act. The State may not shirk its legal duties, despite the immense difficulties that are frequently encountered. (Whitree v State of New York, 56 Misc 2d 693, 711.)
The claimant herein, and other owners similarly affected by the act, have the right to bring an action in Supreme Court to have the controls declared unconstitutional, either in toto or as applied against the specific property, on due process grounds as an invalid exercise of the police power. Compelling policy considerations argue that this should be the claimant’s remedy herein. (French Investing Co. v City of New York, 39 NY2d 587, supra; Lutheran Church in Amer. v City of New York, 35 NY2d 121, supra; Arverne Bay Constr. Co. v Thatcher, 278 NY 222.) The "damages” alleged by claimant support such a theory. I note that a number of actions of this nature with respect to the APA have been initiated and are in various stages of litigation. (E.g. Wambat Realty Corp. and Town of Black Brook v Judge, Sup Ct, Clinton County, July 28, 1976, Soden, J.; Adirondack Park Agency v Ton-Da-Lay Assoc., Sup Ct, Schenectady County, Oct. 7, 1976, Graves, J.; Matter of Loon Lakes Estates v Adirondack Park Agency, 83 Misc 2d 686, mod 85 Misc 2d 929; see also, Robinson, Adirondack Land Use in the Courts, NYLJ, Feb 24, 1976, p 1, col 1; Savage and Sierchio, Adirondack Park Agency Act: A Regional Land Use Plan Confronts "The Taking Issue”, 40 Albany L Rev 447.) If, in the course of such litigation, it is determined that the economic and social burden of this regulatory framework falls unfairly on the owners, the act and the regulation thereunder may be held unconstitutional. If the people of the State then so desire, the Legislature may enact appropriate enabling legislation to permit the park’s resources to be protected through other constitutional means, such as by acquisition or condemnation of development rights (see French Investing Co. v City of New York, 39 NY2d 587, 597-600, supra), "negative easements” (Terrace Hotel Co. v State of New York, 19 NY2d 526, supra), or other, more inventive approaches. Unfortunately, as Chief Judge Breitel wrote in the French decision (p 600) "the land planners are now only at the beginning of the path to solution” of "modern zoning, urban and rural conservation, and * * * landmark” problems. It is doubly unfortunate that the "land planners” presently seem to be somewhat in disarray in marshalling their solu *632 tions in this area. (See Costonis, "Fair” Compensation and the Accommodation Power: Antidotes for the Taking Impasse in Land Use Controversies, 75 Col L Rev 1021; Berger, Accommodation Power in Land Use Controversies: A Reply to Professor Costonis, 76 Col L Rev 799.) Hopefully, and I believe expect-ably, the give and take in this arena will eventually provide us with reasonable solutions. However, until such solutions are at hand, the courts of this State should, when considering land use regulatory statutes and police power, hark to the wisdom of Judge Cardozo who wrote: "We think that the power of the State is not so great, nor the plight of the citizen so helpless.” (Jackson v State of New York, 213 NY 34, 35.)
There was some slight indication, possibly because of the recognition of the expanded and expanding utilization of the "police power” to meet environmental problems and the economic burdens which are being thrust thereby upon the few for the benefit of the many, that, if a regulatory statute is declared unconstitutional, the landowner may sue to recover the losses he sustained as the result of the temporary economic loss of his real property. (See French Investing Co. v City of New York, 39 NY2d 587, 599, supra; cf., Keystone Assoc. v State of New York, 33 NY2d 848, 850, dissent of Breitel, J.) I trust that I am correct in discerning such an indication for, in my opinion, the possibility of tax moneys being available in such instances should curb unbridled legislative enthusiasm for the police power device and unbridled beaurocractic enthusiasm in interpreting and enforcing the regulatory statutes. However, whether the courts will apply the law of damages for a temporary de facto appropriation to police power regulatory land use cases must abide that question being specifically brought into focus in the proper case. As the claim at bar alleges damages for a permanent de facto appropriation, such question is not properly before me for a ruling.
The defendant’s motion to dismiss the claim herein is granted.