**OCEANIC CALIFORNIA, INC., a California Corporation, Plaintiff,**

v.

**CITY OF SAN JOSE, a Municipal Corporation, Defendant.**

No. C–78–2622 AJZ.

United States District Court,
N. D. California.

Aug. 21, 1980.

Ellman, Passovoy & Burke, Howard N. Ellman, San Francisco, Cal., for plaintiff.

Berliner, Cohen & Biagini, Andrew L. Faber, Robert Logan, City Atty. of San Jose, San Jose, Cal., for defendant.

OPINION AND ORDER DENYING MOTION FOR ABSTENTION AND GRANTING MOTION TO DISMISS

ZIRPOLI, District Judge.

Plaintiff, Oceanic California, Inc. (hereinafter "Oceanic") alleges in its First Amended Complaint that defendant, the City of San Jose ("the City"), has deprived it of "the entire, economic beneficial use" of its property, some 7,300 acres of land lying within the City. Oceanic charges that the City has forced Oceanic to hold the land as a "public viewshed," with no corresponding benefit accruing to Oceanic and without just compensation from the City. The complaint is premised exclusively on the Fifth and Fourteenth Amendments of the United States Constitution.

Four claims for relief are set forth. The first seeks damages in inverse condemnation for the asserted unconstitutional taking of the property, in the amount of $30 million. The second seeks a declaratory judgment that the land has been taken, through regulations and other "purported exercises of the police power" which were and are arbitrary, capricious, unreasonable and discriminatory. The judgment sought would declare the offending land use regulations invalid to the extent they have effected a taking of Oceanic's property. The third seeks, as an alternative to the damages sought in the first claim, a mandatory injunction ordering the City to adopt regulations which will allow the City a "reasonable, economic beneficial use of its property." The court is asked to retain jurisdiction following issuance of the requested order to ensure that the City does not fail to comply "by artifice, subterfuge and delay." Complt. paras. 3, 38–40. The fourth, added by amendment, alleges a separate taking with respect to taxes and assessments imposed on Oceanic, assertedly for the purpose of paying for "urban services" to the property, services which the City allegedly represented it would provide but never did provide. The theory of this fourth claim is that the withholding of the services, specifically, sewer lines, and the simultaneous assessment of taxes and levies therefor

against Oceanic, amounted to a deprivation of the funds paid. Oceanic seeks the amount of those funds as recovery.

This court's jurisdiction is proper under 28 U.S.C. sections 1331 and 2201.

The City moves the court to dismiss the complaint for failure to state a claim, Fed. R.Civ.P. 12(b)(6), or, in the alternative, to abstain from the exercise of jurisdiction.

*Allegations of the complaint*

The pleading under scrutiny is lengthy and a detailed recitation of Oceanic's versions of the history of the City's actions, representations, land use policies, regulations, and planning activity with respect to the property. Although the complaint perhaps does not comport with the letter of Rule 8(a)(2), Fed.R.Civ.P., it is apparent that Oceanic's theory of the case has dictated its decision to file this prolix and complex pleading. Oceanic does not purport to premise its taking claim on the existence of a zoning ordinance. Nor is any expressly facial attack made on the City's general plan[1] or other official statement or enactment pertaining to land use policy. Instead, the complaint is leveled at the City's alleged deliberate creation of a "regulatory condition" whereunder "all feasible development" of the property is rendered impossible, even though, for example, the most recent general plan purports to permit various uses.[2] Oceanic further charges that even the permitted uses under the general plan would yield "no economic, beneficial use"; specifically, each permitted use "would cost more to implement and maintain than the gross income therefrom would yield." Complt. para. 12. The complaint is aimed at the City's alleged intent, as manifested in the history of conduct recited, to force Oceanic to maintain the land as a public viewshed at Oceanic's sole expense after a long period of fostering its expectations of intensive residential development. However, the averments are not easily encapsulated and merit further explication.

 The court, in proceeding to a more particular scrutiny of the complaint, is mindful of the liberal standards to which the allegations are to be held on a motion to dismiss and of the fact that those standards are not made more severe because an ostensible exercise of governmental police power is challenged. *See Jacobson v. Tahoe Regional Planning Agency*, 566 F.2d 1353, 1359 n.9 (9th Cir. 1978), *modified on other grounds sub nom. Lake Country Estates v. Tahoe Planning Agency*, 440 U.S. 391, at 397 n. 11, 99 S.Ct. 1171 at 1175 n.11, 59 L.Ed.2d 401 (1979). At the same time, the court is not bound to ignore legally significant facts disfavorable to plaintiff which appear on the face of the complaint or which are proper subjects of judicial notice; if such facts create an insurmountable obstacle to obtaining relief, dismissal is proper. *See Thomas W. Garland, Inc. v. City of St. Louis*, 596 F.2d 784, 787 (8th Cir. 1979) (dicta); 2A Moore's Fed.Prac. ¶ 12.08 at 2271 (2d ed. 1979). With these considerations in mind, the court turns to the factual averments tested by the City's motion.

Oceanic is a land developer. In the early 1960's its predecessor[3] purchased some 11,000 acres of land in a then–unincorporated

---

1. A "general plan" is a creature of California statute, *see* California Government Code § 65300 *et seq.* Such plans are promulgated by cities and counties and are amendable, flexible devices for long–range land use planning. *See e. g.* California Government Code § 65356.1 (West Supp.1980); *Selby Realty Co. v. City of San Buenaventura*, 10 Cal.3d 110, 117–118, 109 Cal.Rptr. 799, 514 P.2d 111 (1973); *Mountain Defense League v. Board of Supervisors, San Diego County*, 65 Cal.App.3d 723, 135 Cal.Rptr. 588 (1977). *See generally*, Perry, *Local "General Plan" in California*, 9 San Diego L.Rev. 1 (1971). Every California city must adopt a general plan, and every plan must include an "open space element" designed to preserve open space. See Cal.Govt.Code §§ 65700, 65560 (West Supp.1980).

2. Agriculture, commercial recreation compatible with the plan's contemplated open space uses, and non–urban residential use (one dwelling per twenty, or five, acres, depending upon the physical character of the land). Complt. paras. 11, 22.

3. Lake Anderson Corporation. Oceanic is and Lake Anderson was a subsidiary of Castle & Cook, Inc. References in this opinion to "Oceanic" or "plaintiff" encompass Castle & Cook, Inc. and Lake Anderson Corporation.

portion of Santa Clara County. The property is about fifteen miles from the City's downtown area, in a hilly region in the path of the seventeen mile long Coyote Valley Park Chain. Within the approximately 7,300 acres now within San Jose and at issue in this case there is a golf course and the Lake Anderson Recreational Facility. (Whatever monetary return or other value Oceanic may derive from these uses of the property does not appear from the complaint, nor from the exhibits appended thereto.)

Oceanic claims that the City induced it to buy the land in the first place, on the representation that the City would fully support intensive urban development there. Specifically, San Jose's then City Manager flew to Hawaii in 1963 to persuade plaintiff's board of directors to invest in land for development, and promised the City's full cooperation; Oceanic would not have made the purchase without that representation.

Also in 1963, the City annexed the 7,300 acres and zoned it under two classifications, R–1:B–1 and R–1:B–3. These permitted one family dwelling per 10,000 square feet and one family dwelling per acre, respectively. The land has not since been rezoned.

In the late 1960's, Oceanic successfully developed that portion of the 11,000 acres which fell within the City of Morgan Hill or within still–unincorporated portions of Santa Clara County.

The complaint places these and subsequent events against a backdrop of the City's former "well–publicized policy" of promoting rapid urban expansion, and its search for a developer whose resources and holdings would be sufficient to undertake the creation of a "new town" project. Complt. paras. 16–17. The new town project Oceanic contemplated then (in the 1960's) was to have: (1) extended over most of the 11,000 acres, (2) included commercial and service facilities as well as residences, and (3) housed an ultimate population of about 100,000.

Oceanic lists a number of "illustrative" instances of what it terms the City's "strong encouragement of the New Town Project, and of Plaintiff's efforts to accommodate the City's desires." Complt. para. 20. Among these are the following two:

■ In 1966, City held a municipal election in which Measure H, providing for Four Million Dollars ($4,000,000.00) in bonded indebtedness for a sanitary sewer system, was put on the ballot. In the campaign preceding said election, City represented that funds obtained through the sale of the bonds sought to be approved by said Measure H would be expended in part on the construction of a sewage system serving the . . . Property. The voters approved Measure H. Accordingly, in every year from 1966 until 1975, City's Capital Improvement Program allocated in excess of Seven Hundred Thousand Dollars ($700,000.00) of the 1966 bond fund to construction of a sanitary sewer system for the . . . Property. This allocation has now been deleted.

■ City participated in discussions between Plaintiff and the California Division of Highways (subsequently Caltrans) regarding construction of the proposed South Valley Freeway and appropriate access roads to serve the New Town Project, and on August 21, 1967, entered into an agreement with the Department of Public Works as to the freeway route and appropriate interchanges. The settlement between Plaintiff and Caltrans as to a right of way on the . . . Property contemplated that City would participate in constructing certain access roads to link the new freeway to the New Town Project.

Complt. paras. 20(c) and (f).

The above recitations, in conjunction with paragraphs 26(a), (b) and (d), are set forth in evident support of the fourth claim for relief as well as in support of the complaint's allegation that the City reneged on its "prior commitments to support intensive

urban development" on the Oceanic land. Complt. para. 26.[4]

Oceanic asserts that it made "major expenditures" in "reasonable reliance" on the City's support. It states that these costs were incurred to collect geologic and engineering data, to "analyze the cost and fiscal impact of the New Town Project," and to "prepare appropriate applications for rezoning, subdivision approval and related permits," Complt. para. 20.

In 1970 the City "initiated" an "Urban Redevelopment Policy" designating the property as "urban reserve": land not readily accessible to highways or utility extensions and not "required for urbanization within the next fifteen (15) years." Most of the land was designated " 'hillside,' with a recommended density" of one dwelling per five acres. Oceanic objected, and the City Council made a "clarifying" statement:

"The density of one dwelling unit per five acres is not intended to discourage any owner or developer of a large tract of land from submitting a plan of outstanding quality; said plan may include where appropriate one or more of the following elements: community or neighborhood development, a variety of housing types; provisions for density transfers; public facilities such as schools, shopping and recreation; vehicular circulation; a trail system for hiking and riding; and sub-

stantial commitments of permanent open space. Such plans for any particular planning area may be higher than one dwelling unit per five acres, without a commitment as to where such higher densities may be located. Such plans would be reviewed in accordance with the policies for annexation and development." Complt. para. 22.

The Urban Redevelopment Policy was not adopted as a zoning ordinance, but as a 1971 amendment to the City's 1966 General Plan.[5] The above language was included. Oceanic alleges that the amendment otherwise "continued to reflect the New Town Project, and thus encouraged Plaintiff to continue its development efforts." Complt. para. 22.[6]

In April of 1973, the City published an "Open Space Element,"[7] which, Oceanic alleges, purported to be an articulation of the Urban Redevelopment Policy, and which recommended "drastic" restriction of development of hillside slopes of fifteen percent or more (a description fitting "much" of Oceanic's land). It also "suggested that the City use its police power to preserve open space within its boundaries," Complt. para. 23. Oceanic objected to the adoption of the policy and to its inclusion in any City general plan. Complt. para. 23.

Also in 1973 Oceanic filed a rezoning request for a planned development of some

---

**4.** In paragraph 26(a) and (b), it is alleged that in May of 1974 the City "deleted the reference in its Capital Improvements Program to use a portion of the 1966 bond fund to construct a sanitary sewer system to serve" the Oceanic land, and that in April of 1975, the City "recommended" a compromise in order to facilitate the building of the delayed freeway. The compromise "deleted" the interchange Oceanic desired and reduced the freeway from 8 lanes to 6. The City also, it is charged, denied Oceanic's "request" to include the interchange in the transportation component of the 1975 General Plan. *See infra.*

Oceanic concludes that "by this and other action" the City deprived it of "all feasible means of obtaining public road access" to the property. The complain does not specify to whom the City "recommended" the compromise.

**5.** See note 1, *supra.*

**6.** It is also claimed that the City continued to allocate funds to the sewer system and stated, in a document entitled "Capital Improvement Program, Five Years: 1972–77," that the sewer project " 'represents a pre–existing commitment of the City which pre–dates the adoption of the Urban Redevelopment Policy . . .' " (Emphasis supplied in Complaint.) Complt. para. 22.

**7.** California law requires and in 1973 required cities to include an "open space element" in their general plans, pursuant to the stated legislative intent of preserving open space. *See* California Government Code §§ 65302(e), 65560–65563 (West Supp.1980). This requirement applies to all cities in the state, with special exemptions only for those, unlike San Jose, incorporated after September 1, 1973, and before December 31, 1973. California Government Code §§ 65302(i), 65302.4 (West Supp. 1980).

5,000 housing units, as well as commercial and recreational facilities, on all but 22 acres of the property. Oceanic then avers that "in order to accommodate City's concern over alleged geologically sensitive areas," it reduced the number of units for this project ("Rancho San Jose") to 3,000. The City asked that 4,000 acres be redesignated permanent open space as a condition to approval of the rest of the project. Oceanic rejected this request. Complt. para. 24.

Prior to any formal action by the City on the rezoning request, Oceanic withdrew it. Oceanic alleges as the reason for the withdrawal the suggestion of then–mayor Mineta, who wished to facilitate the City Council's approval of an application of IBM to build an "industrial facility" on other land, also designated as "urban reserve" and "open space." The complaint alleges that Mineta stated that if both IBM's and Oceanic's applications were heard at the same time, neither was likely to be approved, "whereas if the IBM application was heard and approved first, the need for Plaintiff's proposed residential development would be even greater," Complt. para. 25. A general plan amendment was "prepared" to show the IBM facility on previously–designated open space land; it also included a land–use element for the Oceanic land which incorporated the 1973 Open Space Element. Oceanic protested, and was "assured" by the then City Manager that the plan was temporary and would be followed by a general plan amendment "providing the development of the Coyote Valley." The complaint further alleges that the "City stated" that Oceanic should refile after approval of the IBM construction. Complt. para. 25.

The complaint next sets forth a series of actions by the City which Oceanic characterizes as a "course of conduct directly contrary to its prior commitments to support intensive urban development" of the Oceanic land. Complt. para. 26. Included in this conduct are the actions taken with respect to sewers and the freeway interchange, see discussion *supra*.

Also included is the City's March 1976 promulgation of the 1975 General Plan,[8] the subject of considerable attention by both parties for purposes of the instant motion.

Oceanic alleges that the Plan "purports to permit various uses" of the property, including agriculture, nonurban hillside residential use (one dwelling per twenty acres), and commercial recreational use (compatible with open space uses), Complt. para. 11. Elsewhere, it alleges that the Plan designates "most" of the Oceanic land as "rural residential" (one dwelling per five acres permitted) or the aforementioned "nonurban hillside," Complt. para. 25(c). The Urban Development Policies were adopted in the Plan.

At about the same time, the land was placed outside the "Urban Service Area," thereby requiring Oceanic to meet certain "exception criteria" to develop its land for

8. The City has asked the court to take judicial notice of the General Plan, as well as four other documents lodged with the court: the Plan's Land Use/Transportation Diagram (Exh. B), a United States Department of the Interior Geological Survey map covering the area in which the Oceanic property lies (Exh. C), Ordinance No. 13026, adopted by the City on November 29, 1965, and containing resolutions concerning the municipal bond election adverted to in the complaint (Exh. D), and the City's charter (Exh. E).

Oceanic has not opposed these requests, which the court grants as proper under Rule 201, Fed.R.Evid. *See Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977) (notice of matters of public record, including official municipal enactments, proper); *United States v. Trenary*, 473 F.2d 680, 682 (9th Cir. 1973) (map). The court may also take judicial notice of state statutes, *Newcomb, supra*; the provisions of the California Government Code referred to throughout this opinion are noticed pursuant to Rule 201.

More importantly, averments of the complaint which are contrary to the matters judicially noticed may be disregarded on a motion to dismiss without transforming the motion into one for summary judgment, *Newcomb v. Brennan, supra*; *Bryant v. Liberty Mutual Ins. Co.*, 407 F.2d 576, 579 (4th Cir. 1969); *Saxton v. McDonnell Douglas Aircraft Co.*, 428 F.Supp. 1047, 1049 n.5 (C.D.Cal.1977). This principle is fully applicable to the motion at bar.

Citations herein to the General Plan (Exh. A) will be in the form "GP at ——." References to the other exhibits will be according to their designated letters, as "Exh. B," and so on.

uses requiring "Urban Service." Complt. para. 26(c); see GP at 24–25, 52.

In February of 1976, Oceanic filed a revised "Planned Development Rezoning and Prezoning Application" proposing a development of 2,950 dwellings on 2,821.5 acres of the land. This acreage was to be subtracted from the portion which Oceanic claims it offered for public acquisition. (Oceanic alleges that it offered 8,416 acres for sale to the County of Santa Clara in December of 1975, at a price of $11,500,000. The County assertedly replied that the City "should be the 'lead agency' in pursuing the offer," Complt. para. 27.) The City denied the application.

In 1978, Oceanic began formulation of a development proposal based on the general plan's one dwelling per twenty acre designation, and made "inquiries" of the City's planning staff. The staff told Oceanic that no "design criteria" has been formulated because such a development "had never been expected." Oceanic does not allege that it ever presented the proposal to the City for official action.

From this summary of the recitations of the complaint, the court turns to consideration of the applicable law.

I

*Abstention*

The complaint in this case is expressly founded solely on federal constitutional claims. Abstention is plainly inappropriate.

■ Three conditions must be satisfied before the court has discretion to abstain: (1) The complaint "touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open." (2) Such constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy." (3) The possible determinative issue of state law is doubtful. *Pue v. Sillas,* 632 F.2d 74 at 78 (9th Cir. 1980), *quoting Canton v. Spokane School*

*Dist. No. 81,* 498 F.2d 840, 845 (9th Cir. 1974).

■ The City bases its argument for abstention principally on the first prong of the Canton test, making the unexceptionable claim that land use planning in general is a "sensitive issue of social policy." *See Santa Fe Land Improvement Co. v. City of Chula Vista,* 596 F.2d 838, 840 (9th Cir. 1979); *Sederquist v. City of Tiburon,* 590 F.2d 278, 281 (9th Cir. 1978); *Rancho Palos Verdes Corp. v. City of Laguna Beach,* 547 F.2d 1092, 1095 (9th Cir. 1976). Little or no attention is paid to the other two requirements of the test, however, and the complaint here meets neither of them.

First, it does not appear that the constitutional adjudication sought by Oceanic "plainly can be avoided" by the adjudication of any state issue. The failure of the parties to specify such a state issue does not of itself preclude abstention, *see Sante Fe Land Improvement Co., supra,* 596 F.2d at 840, but it is apparent to the court that Oceanic's damages claims would survive any hypothetical adjudication of a state question. *See Agins v. City of Tiburon,* 24 Cal.3d 266, 157 Cal.Rptr. 372 (1979) (damages in inverse condemnation unavailable where taking claim premised on application of land use regulation), *aff'd on other grounds,* —— U.S. ——, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). Nor is the existence of a "mirror" taking clause in California's constitution a legitimate basis for federal court abstention, *Pue v. Sillas, supra,* at 79–81. Oceanic's complaint is squarely founded on conduct by the City, on the asserted application of state and municipal land use policies and regulations to the land, not on the facial inconsistency of the general plan and zoning ordinances nor indeed on any contention resolvable purely by resort to interpretation of California law. *Compare Sante Fe Land Improvement Co., supra* (claim of city's arbitrariness and action in excess of jurisdiction based in part on city's failure to follow own procedures in violation of state law).

Because the second prong of the *Canton* inquiry is not met here, neither is the third. There appears no state issue, "doubtful" or otherwise, which would dispose of Oceanic's claim.

"In short, abstention would be justified in this case only if it were appropriate in all California land use cases," *Barbaccia v. County of Santa Clara*, 451 F.Supp. 260, 264 (N.D.Cal.1978).

Accordingly, the court proceeds to the merits of the motion to dismiss.

## II

*Availability of damages*

The City argues initially that the first claim for relief should and may be dismissed without need for the court to decide whether the allegations of the complaint state a taking claim. It is urged that the holding of the California Supreme Court in *Agins v. City of Tiburon*, 24 Cal.3d 266, 157 Cal.Rptr. 372 (1979), not reached by the United States Supreme Court in that case, see —— U.S. at ——, 100 S.Ct. at 2142, should be adopted by this court as the federal rule of decision. Specifically, the City argues that even if Oceanic's complaint is deemed sufficient to state a taking claim under the Constitution, the remedy of damages should be foreclosed in preference of the alternative avenues of declaratory and mandatory relief.

9. The status of monetary relief as a constitutionally compelled remedy for takings effected by municipal land use regulation will be before the United States Supreme Court next term in *San Diego Gas & Electric Co. v. City of San Diego*, · U.S. ——, 100 S.Ct. 3008, 65 L.Ed.2d 1111 (1980).

It should be noted that the decision of *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), may have some independent bearing on the issue as it appears in this case. *Owen* held that municipalities had no immunity from damages actions under 42 U.S.C. § 1983. The City does not rely on any doctrine of "immunity" as that term is usually understood, but on the reasoning of the California Supreme Court in *Agins, supra*, that monetary relief is inappropriate to redress takings effected by land use regulation. (No immunity under state law is asserted, nor would such immunity protect the City from this federal

This argument need not be reached because the court concludes, *infra*, that no federal claim has been stated.[9]

## III

*Existence of a taking*

Any attempt in this case to extract a single act or enactment from the allegations of the complaint as the locus of Oceanic's constitutional challenge would be, the court recognizes, both to mistake the breadth of plaintiff's attack and to misapply the standards applicable to a motion to dismiss. Nevertheless, all analysis is not foreclosed at the early stages of land use cases by the mere invocation of the Supreme Court's statement that it "has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the Government, rather than disproportionately concentrated on a few persons. *See Goldblatt v. Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962)." (*Penn Central Transportation Co. v. New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).) Inevitably, adjudication of inverse condemnation claims based on state and local land–use regulation in the Supreme Court and the Court of Appeals for the Ninth Circuit, over a period stretching from the decisions in *Pennsylvania Coal Co.*

inverse condemnation claim, *see Sanfilippo v. County of Santa Cruz*, 415 F.Supp. 1340, 1343 (N.D.Cal.1976).) An argument could be made that unless the *Agins* holding not reached by the United States Supreme Court is determined to be a correct interpretation of the federal Constitution, damages sought under section 1983 could not be barred on the strength of the California *Agins* rule. This court has no occasion to evaluate the argument, however, nor to consider whether California's withdrawal of damages in inverse condemnation cases premised on land use regulation should be accorded the status of a positive federal constitutional prohibition, applicable equally in district court actions based directly on the Constitution as well as those using section 1983 and 28 U.S.C. § 1343 as the jurisdictional vehicle. The decision herein is limited to a holding that the complaint does not state a federal constitutional claim for relief.

*v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), and *Nectow v. City of Cambridge*, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928), to the recent holdings in *Agins v. City of Tiburon, supra*, —— U.S. ——, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), *American Savings and Loan Assoc. v. County of Marin*, No. 77–3703 (9th Cir., June 13, 1980), and *Haas v. City and County of San Francisco*, 605 F.2d 1117 (9th Cir. 1979), has resulted in the creation of increasingly specific principles and guidelines. These must provide the focus of decision here.

## A. Validity of the City's enactments as exercise of police power

■ Constitutional challenges to land use restrictions are based typically on either or both of two analytically distinct grounds: that the official acts in question do not substantially advance legitimate governmental goals, and that they deprive the landowner of all "economically viable use of his land," *Agins, supra*, —— U.S. at ——, 100 S.Ct. at 2141. Either ground, if successfully urged, suffices to support a conclusion that a taking has occurred.[10] Commonly, both contentions are advanced, and ruled upon, jointly, *see Haas v. City and County of San Francisco, supra*, 605 F.2d at 1120. In the case at bar, Oceanic has adopted this approach, but it is useful, before proceeding to a consideration of the factors which have been held in the past cases to permit or preclude the finding of a taking, to discuss briefly the aims advanced in support of the enactments at issue here.

■ The 1975 general plan is a principal focus of Oceanic's attack. It is not contended, however, that preservation of open space is not a legitimate, important legislative goal.[11] Nor does Oceanic argue that the general plan does not reasonably relate to the advancement of that goal. Rather, the complaint charges that the general plan, in conjunction with the unaltered high–density zoning classifications and other applicable restrictions, creates a "*regulatory condition*, consciously and deliberately created by [the] City" under which no "feasible development" of the property in question could "lawfully be approved," [emphasis supplied] Complt. para. 9. The other aspects of this "regulatory condition" are alleged to be the City's non–provision of sewer service and certain road access, the failure to adopt "implementing development standards," and the adoption of development standards "with which it is intended that" Oceanic cannot comply.

These allegations, however, cannot be said to call into question the strength of the relationship between the "regulatory condition" asserted and the goal of preserving open space. It is not alleged that the Oceanic land was *ever* "developed," with the exception of the golf course and recreational facility.[12]

---

**10.** The Supreme Court phrased the inquiry as follows:

The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests [citation] *or* denies an owner economically viable use of his land [citation].

– – · U.S. at ——, 100 S.Ct. at 2141 (emphasis supplied).

The first prong of this formulation has been alternatively characterized to uphold land use restrictions if they are "reasonably related" to promotion of the general welfare, *see e. g. Penn Central Transportation Co. v. New York City, supra*, 438 U.S. at 131, 98 S.Ct. at 2663. This court does not view the differences in phraseology to indicate a distinction in judicial treatment of challenged land use regulations.

**11.** Nor could such an argument be made. The Supreme Court in *Agins* specifically recognized that California's (and in that case, the City of Tiburon's) policy of discouraging the "premature and unnecessary conversion of open–space land to urban uses" was a valid governmental objective. —— U.S. at ——, 100 S.Ct. at 2141–42, *quoting* Cal.Govt.Code § 65561(b). *See also* Cal.Govt.Code § 65562 (West Supp.1980).

**12.** The complaint itself alleges that the general plan "purports" to permit "commercial recreation of a sort compatible with open space uses," Complt. para. 11. No suggestion is made that Oceanic's interests in the golf course or recreational facility are in any way threatened by the City's conduct.

Recreation is among the land uses sought to be protected by the legislatively mandated duty of cities to preserve open space, Cal.Govt.Code § 65561(a) (West Supp.1980).

More to the point are Oceanic's allegations that (1) the general plan's stated policy of preventing development on slopes over 15 percent is a "smokescreen" for the City's "imposing a restriction against development upon lands that are virtually flat and other lands of lesser slope where development is feasible as a matter of economics," Complt. para. 26(c), and (2) that the City's approval of construction of the IBM facility belies its stated purpose, as applied to Oceanic's property, of preserving open space, Complt. para. 25.

Although these allegations are apparently meant to support Oceanic's claim that the City's actions manifest an "intent" to foreclose all beneficial use of the property, the court construes them in addition as assertions made in support of an attack on the validity of the applicable land use designations as exercises of the City's police power.

Neither allegation, however, is adapted to that purpose; neither states a claim that the City's regulatory and planning activity does not substantially advance the goal of stemming urban encroachment on open space.

The first allegation requires some elaboration. Oceanic states that the general plan's open space element restricted development on slopes of 15 percent or more, and that the plan's designation of much of Oceanic's land as "Non–Urban Hillside" (permitting one dwelling per twenty acres) was "allegedly intended" to implement that restriction. However, it is asserted, the Non–Urban Hillside designation

> in effect prohibits development of any area above the *lowest elevation* at which fifteen percent (15%) slopes occur, even though the higher elevations of the . . . Property include substantially flat pla-

teaus and areas of slope of significantly less than fifteen percent (15%).

Complt. para. 26(c) [emphasis in original].

The general plan itself explains the Non–Urban Hillside designation in relevant part as follows:

> This land use is proposed for most hillside areas above the fifteen percent slope line. Because of the pervasive geologic problems in the hills (landsliding, soilcreep, earthquake faults) and the extraordinary public costs of hillside development, uses must be limited to those having very little physical impact on the land and requiring no urban facilities or services. There is also a need to preserve watershed and prime percolation soil areas. Agriculture, such as grazing and tree farming, and very large lot "residential estates" are the planned uses under this category.
>
> The intent of this non–urban category is to reflect a very low intensity of use *for the hillside area as a whole.*

GP at 39 [emphasis supplied].

Oceanic does not allege or suggest that the selection of the 15 percent slope line does not reasonably contribute to the legitimate aim of preserving low intensity land use for the hillside area, an aim which appears on the face of the general plan, of which the court may properly take judicial notice.[13] (That the designation may or has already deprived Oceanic of all reasonable use of its land is a separate question, which the court addresses *infra.*) Plainly, the designation is not limited in its aims to barring development for purely economic or safety reasons.[14] Because Oceanic has not alleged that its land has ever been used in a manner incompatible with the open space preservation policies of the City[15] (and of the state), designation of the property for such "preservation" in 1975 or subsequently,

---

**13.** See note 8, *supra. See also U. S. v. Carolene Products Co.*, 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938).

**14.** The court also takes notice of the fact that preserving open space for agricultural use is an express goal of California's open space preservation policies, *see* Cal.Govt.Code § 65561(a) (West Supp.1980); *see generally* Comment, *Ag-*

*ricultural Land Preservation in California: Time for a New View*, 8 Ecology L.Q. 303, 305–316 (1979).

**15.** Indeed, the complaint makes precisely the opposite contention: that the land has *not* been developed, due to the City's actions.

whether accomplished by means of the chosen "slope line" method or otherwise, is not susceptible to a claim that valid land use goals are not furthered thereby.

Finally, the tentative, amendable nature of the general plan [16] makes it an improper target for a claim that the slope line as applied to Oceanic's land does not advance the City's legitimate land use concerns. *See Agins, supra,* —— U.S. at ——, 100 S.Ct. at 2140.[17]

The allegation regarding the City's approval of the IBM construction stands on somewhat different footing. The approval occurred prior to the promulgation of the 1975 general plan, although the complaint alleges that an amendment to the previous general plan was prepared to show the facility on property previously designated for open space use. Although Oceanic does not specifically so contend, it is possible to construe the complaint's brief narrative of the circumstances surrounding the IBM application, see Complt. para. 25, as an allegation supporting not only the assertions of the City's "prior commitments" to plaintiff, but also as an attack upon the City's fidelity to the legislative goals advanced to support the 1975 general plan and the current "regulatory condition" as a whole. Giving Oceanic the benefit of such an inference, as the court must on a motion to dismiss, the court nonetheless concludes that the addition of the allegations does not alter the determination that no claim has been stated that the land use policies covering the Oceanic property do not reasonably relate to the aim of preserving open space.

Even interpreted in Oceanic's favor, these allegations amount to a contention that municipally approved loss of open space in one area must be followed consistently by further losses in other areas. This line of analysis leads logically to the direct opposite of the result sought by California's open-space policies and legislation and by the local land use regulation to be pursued thereunder. Those policies, sanctioned by the *Agins* decision, could not possibly bear the brunt of such an argument. It is evident on the face of the applicable California legislation and policy declaration, *see generally* Cal.Govt.Code §§ 65560–65570, that cities and other local entities are charged with the responsibility to check urban encroachment into open land areas. If an incursion in one place were deemed constitutionally to require incremental advances in every other similar area of open space remaining in order for challenged land use regulation to be found a reasonable promotion of the goal of open space preservation, the goal itself (and the land) would be quickly engulfed. In this area, as in others involving "general welfare" legislation, action taken a step at a time is permissible. *See Firemen's Ins. Co. of Washington, D. C. v. Washington,* 483 F.2d 1323, 1328 (D.C.Cir. 1973), *citing Village of Euclid v. Ambler Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), and *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). *See also Miller v. Schoene,* 276 U.S. 272, 279, 48 S.Ct. 246, 247, 72 L.Ed. 568 (1928); *Ensign Bickford Realty Corp. v. City Council,* 68 Cal. App.3d 467, 137 Cal.Rptr. 304 (1977). Oceanic's advertence to the City's action with respect to the IBM facility in this context represents a claim that government may not "retreat" a step at a time without abandoning any claim of legitimacy to the line where the incursion is halted.

In sum, the court concludes that Oceanic's complaint does not state a claim that the applicable land use planning policies and regulations are not within the proper scope of the City's police power.

---

16. See note 1, *supra.*

17. The *Agins* case involved a more specific and direct variety of land use regulation: a zoning ordinance. General plans are instruments of long range planning rather than particularized, directly applicable sets of proscriptions and authorizations. *See* Cal.Govt.Code § 65302(a), § 65356.1, § 65361 (West Supp.1980). Thus, the conclusion that a facially valid exercise of police power has been made is more readily drawn in the case of a general plan than in the case of a zoning classification. *See Selby Realty v. City of Buenaventura, supra,* 10 Cal.3d 110, 118, 109 Cal.Rptr. 799, 514 P.2d 111 (1973). See also note 21, *infra.*

## B. Deprivation of use

The court next turns to the question whether Oceanic's allegation that it has been deprived of "the entire, economic beneficial use of its Property," together with the other allegations of the complaint, precludes dismissal, or whether matters judicially noticeable and certain of the allegations instead require the granting of the motion.

In determining whether a taking has been made out, the focus of inquiry must be on the uses permitted, *Penn Central Transportation Co. v. New York City, supra,* 438 U.S. at 131, 98 S.Ct. at 2663; *American Savings & Loan Ass'n v. County of Marin, supra,* at ——. If no "economically viable use" remains, *Agins v. City of Tiburon, supra,* —— U.S. at ——, 100 S.Ct. at 2140, a taking has occurred.[18]

In this regard, it is significant that Oceanic has affirmatively alleged that the City "has never expressed any interest in purchase of the property." Complt. para. 27. The presence of an intent ultimately to acquire property, and the utilization of land use regulation as a step in such a plan, has been of considerable weight in the determinations of other courts on the taking issue. *See Barbaccia v. County of Santa Clara,* 451 F.Supp. 260 (N.D.Cal.1978), *Trust of Three v. City of Emeryville,* 430 F.Supp. 833 (N.D. Cal.1977), *Horizon Adirondack Corp. v. State of New York,* 88 Misc.2d 619, 388 N.Y.S.2d 235 (Ct.Cl.1976). *See also Agins v. City of Tiburon, supra,* —— U.S. at —— n. 9, 100 S.Ct. at 2142 n. 9; *Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency,* 561 F.2d 1327 (9th Cir. 1977). This factor, while not a necessary condition to the existence of a taking, nevertheless by its absence militates against the conclusion that one has been stated here.

The uses permitted by the 1975 general plan, according to the complaint and as they appear in the plan itself, are agriculture, commercial recreation of a kind compatible with open space uses, and residential use of two densities: one dwelling per five acres, and one dwelling per twenty acres.

Oceanic makes two charges with respect to these uses. First, it alleges that while the plan "purports" to allow the specified uses, Complt. para. 11, they are in fact statements of a "generalized objective" and that the City has not adopted any ordinances or other more particular and concrete standards by which a developer's "concept" may be evaluated in advance to determine if approval will be possible. Second, it alleges that even if such implementation steps were taken by the City, none of the permitted uses would be "economic, beneficial" ones for the property, "for the reason that each of the uses permitted under [the plan] would cost more to implement and to maintain than the gross income therefrom would yield," Complt. para. 12.

The first contention is premised in part on the incorrect statement that the City has a state–mandated duty to conform its zoning ordinances with its general plan. *See* Cal.Govt.Code § 65803 (exemption of charter cities from "consistency" requirement).

---

**18.** The Supreme Court did not elaborate on the meaning of "economically viable." In *American Savings & Loan Ass'n v. County of Marin, supra,* at ——, the Ninth Circuit, citing only to the California Supreme Court's *Agins* decision, stated that no taking would exist if "a reasonable use" of the property remained. (*American Savings* was decided three days after the United States Supreme Court issued its opinion in *Agins.*)

This court does not view the "economically viable" language to intimate that the Taking Clause guarantees landowners an economic profit from use of their land. This court is unwilling to attribute to the phrase, standing alone, a major departure from prior jurisprudence in this area.

In *Andrus v. Allard,* 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979), the Court stated with respect to a "lost future profits"–based taking claim that:

> [p]rediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform. Further, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property–related interests.

The court does not perceive the *Agins* language ·in any way as a repudiation of this reasoning.

More importantly, Oceanic has never presented to the City its development plan conforming with the one dwelling per twenty acre designation, for official approval or disapproval. It alleges merely that its proposal was presented to the "planning staff" and that the staff stated that such a proposal had not been expected. Oceanic has by its pleadings placed itself, therefore, in the position of the landowner in *Agins*; it has not taken the formal steps necessary for the City to act to approve or deny the project Oceanic has in mind. In sum, the general plan on its face permits at least three varieties of permissible land use. Zoning inconsistent with the plan presents no legal obstacle to those uses. Oceanic is still at liberty to present its proposal to the City for official action thereon. No taking on these facts has yet been stated. *See Dale v. City of Mountain View*, 55 Cal. App.3d 101, 107–110, 127 Cal.Rptr. 520 (1976).

However, the complaint also places in issue Oceanic's 1976 "Planned Development Rezoning and Prezoning Application," assertedly denied by the City. On the face of the description of this proposed development in the complaint (paragraph 28), it is apparent that it does not comport with the general plan; as explained, Oceanic purports to make no facial attack on the plan. To the extent the denial is alleged as a confiscatory application of the plan, it must fail.

■ Oceanic has no "vested right" in the particular development it proposed, under California law. *Avco Community Developers, Inc. v. South Coast Regional Commission*, 17 Cal.3d 785, 132 Cal.Rptr. 386, 553 P.2d 546 (1976), *cert. denied*, 429 U.S. 1083, 97 S.Ct. 1089, 51 L.Ed.2d 529 (1978). Nor can Oceanic's alleged expectations of future high intensity use approval be a proper basis of the "as applied" attack it makes here. *See HFH, Ltd. v. Superior Court*, 15 Cal.3d 508, 515–16, 125 Cal.Rptr. 365, 542 P.2d 237 (1975); *see also Carty v. City of Ojai*, 77 Cal.App.3d 329, 143 Cal.Rptr. 506 (1978). The Supreme Court in *Agins, supra,* noted that the landowners there were "free to pursue their reasonable investment expectations by submitting a development plan to local officials," —— U.S. at ——, 100 S.Ct. at 2142. For that reason, no taking could be said to have occurred at the juncture reached by the landowners. The Court cited to *Penn Central, supra,* which adverted to "distinct investment backed expectations" as one of the "relevant considerations" to the determination of the existence of a taking. What exactly comprises a "reasonable investment expectation," and whether such an expectation can be said to constitute a cognizable property right subject to confiscation, *see Andrus v. Allard*, 444 U.S. 51, 65–66, 100 S.Ct. 318, 362–327, 62 L.Ed.2d 210 (1979), are questions not directly answered by any Supreme Court opinion.

The development proposal submitted in 1976 by Oceanic was far outside the parameters of the general plan. Nor, in the view of the California cases cited above, can it be said that Oceanic's expectations with respect to the particular proposal were "reasonable." Intensive development of the sort Oceanic sought is and was, as alleged in the complaint, "a lengthy and complex process," Complt. para. 15. The complaint's history of informal, unofficial "inducements" by various City personnel cannot be deemed to somewhat give rise to a binding legislative commitment to the particular proposal eventually submitted. The rezoning requested, for example, could not be accorded unilaterally by any of City officials named in the complaint, *see* Exh. E (Charter of the City of San Jose, Art. VI § 600 *et seq.*) Finally, no existing use of the property is alleged to have been stopped, interfered with, or in any way altered by the acts complained of. *Compare Penn Central, supra,* 438 U.S. at 125–126, 98 S.Ct. at 2660 and cases there cited. *See also M. J. Brock & Sons, Inc. v. City of Davis*, 401 F.Supp. 354 (N.D.Cal.1975). In short, the complaint does not set forth allegations of the kind of reasonable invest-

ment expectations cognizable as a possible partial basis for a taking claim.[19]

■ The court therefore turns to Oceanic's second contention with respect to permissible uses under the general plan: that Oceanic "would have" no "economic benefical use"[20] of its property if the City in fact were to allow development in accordance with the three uses designated by the plan, Complt. para. 12, (agriculture, recreation, and residential use within the two specified densities). More particularly, Oceanic alleges that each of the three uses "would cost more to implement and maintain than the gross income therefrom would yield," Complt. para. 12.

The legal sufficiency of these contentions must be considered in light of the enactment which in effect they challenge: the general plan itself. None of the land use limitations are alleged to have been applied to Oceanic's property; the substance of the allegations is that "if" they were applied, Oceanic "would" be left without a profitable use of the land, Complt. para. 12.

This court sees no basis for according these allegations treatment different from that given by the Supreme Court to the allegations in *Agins, supra.* Here, as in that case, the property owner has sought to avoid a judicial conclusion that a land use enactment was the target of attack. While Oceanic argues that it has alleged "implementation" of the general plan, the averments of the complaint demonstrate otherwise. The restrictions complained of derive solely from the City's long–range planning policies, embodied in the plan. Indeed, the *Agins* case presented a more immediate application of official restriction than that involved here. The landowners in *Agins* attacked, or rather were deemed to have attacked, a zoning ordinance. The zoning applicable to Oceanic's land has not altered since the time it purchased the property.

The court's inquiry must therefore focus upon whether plaintiff has stated a claim that the general plan on its face deprives Oceanic of all reasonable use of the property.[21]

**19.** A similar analysis is appropriate with respect to Oceanic's allegations that by being placed outside the "urban service area," its land cannot lawfully be provided sewer service, and that the land lacks the specific road access it wants. First, provision of sewers is a matter within the discretion of the municipal legislative body under California law, *see Richards v. City of Tustin,* 225 Cal.App.2d 97, 37 Cal.Rptr. 124 (1964); *and cf. Vicksburg v. Vicksburg Waterworks Co.,* 202 U.S. 453, 26 S.Ct. 660, 50 L.Ed. 1102 (1905). *See also* Cal.Govt.Code § 38900. Oceanic's grievance with respect to sewer service is based upon the defective basis that it has an entitlement to a specific development which would need such service.

With respect to road access, Exhibits B and C show the existence of roads leading to and across the property, with access onto the Monterey Highway. And again, Oceanic cannot legitimately lay claim to the specific freeway interchange it desires, a matter which lies outside the sole power of the City in any event. When and if Oceanic submits some development plan for official action by the City, within the scope of what are alleged to be permitted uses under the general plan, and the City acts affirmatively to deny services, an allegation of such denial would stand on different footing than the allegations here at issue.

Finally, the complaint itself alleges the existence of "exception criteria" under which services might be extended. *And see* GP at 52.

**20.** Landowners cannot premise a taking merely upon loss of the "best use" of their property. There is dictum in the *Agins* decision which may conceivably be read to negatively imply a contrary conclusion:

> Although the ordinances limit development, they neither prevent the best use of appellants' land, see *United States v. Causby,* 328 U.S. 256, 262 and n.7 [66 S.Ct. 1062, 1066, 90 L.Ed. 1206] (1946), nor extinguish a fundamental attribute of ownership, see *Kaiser Aetna v. United States,* 444 U.S. [164] at 179 [100 S.Ct. 383 at 393] [62 L.Ed.2d 332]. —— U.S. at ——, 100 S.Ct. at 2142.

This passage, in conjunction with the paragraph which follows it, is most reasonably read as a statement of one of the factors which would be taken into account if the appellants there were to submit a proposed development plan.

The Court's citation elsewhere in the *Agins* opinion to its decision in *Penn Central* indicates the long–standing rule that deprivation of property's "best use" does not of itself mean that a taking has occurred.

**21.** As discussed *supra*, the general plan, as a state–mandated instrument of land use planning policy, cannot be claimed to be unrelated to permissible governmental goals. On its face, the sixty–page document and its accompanying land use diagram, see Exhs. A and B, applies to

The general plan at issue "neither prevent[s] the best use of [Oceanic's] land, see *United States v. Causby*, 328 U.S. 256, 262, and n.7 [66 S.Ct. 1062, 1066, and n.7, 90 L.Ed. 1206] (1946), nor extinguish[es] a fundamental attribute of ownership, see *Kaiser Aetna v. United States*, 444 U.S. at 180 [100 S.Ct. at 393]" *Agins v. City of Tiburon, supra*, —— U.S. at ——, 100 S.Ct. at 2142.[22]

The general plan in fact contemplates residential development of the property, although on a scale which Oceanic disfavors. Moreover, there is no contention that the City has in any way restricted Oceanic's right to exclude members of the public from the property, *compare Viso v. State of California*, 92 Cal.App.3d 15, 154 Cal.Rptr. 580 (1979), nor its right to sell the land. Nowhere is it suggested even that the plan effects a present diminution in value of the property. Diminutions in value, moreover, have been repeatedly held not to constitute takings, even when extreme. *See e. g. Penn Central, supra*, 438 U.S. at 124, 98 S.Ct. at 2659; *Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915); *Haas v. City and County of San Francisco*, 605 F.2d 1117 (9th Cir. 1979); *HFH, Ltd. v. Superior Court, supra*, 15 Cal.3d 508, 125 Cal.Rptr. 365, 542 P.2d 237 (1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *Pinheiro v. County of Marin*, 60 Cal.App.3d 323, 131 Cal.Rptr. 633 (1977). *See also Steel Hill Development, Inc. v. Town of Sanbornton*, 469 F.2d 956, 963 (1st Cir. 1972).

Of particular significance is the analysis of a land use limitation in *Haas, supra*, where the landowner raised a similar issue of the lack of "economic viability" of uses

remaining to him. The Court of Appeals responded as follows:

The regulations do not prevent Haas from developing the property, even though the planned development cannot be undertaken. Haas contends that its $1,900,000 loss in value of the property is not the full story because no use for the property remains which is "economically viable." [citation] But Haas' argument that it cannot recover its $2,000,000 investment by constructing low–rise apartment units on the land merely restates the undisputed fact that the value of the property in Haas' hands has been significantly diminished by the regulations. That the zoning restrictions prevent Haas from recovering its investment does not mean that they are constitutionally defective. Of course, Haas would not have paid as much for the property as it did if it had known that it would not be able to build high–rises on it. But its disappointed expectations in that regard cannot be turned into a taking, nor can Haas transform a regulation into a taking by recharacterizing the diminution of the value of its property as an inability to obtain a favorable return on its investment. 605 F.2d at 1120–21.

This reasoning applies with greater force here. Oceanic cannot transmute its disappointment at the planning policies chosen by the City into a claim of taking, especially when those policies have not been reduced to any final, binding form. The general plan merely sets out the uses *contemplated* by the City as appropriate to the Oceanic land. The City is free to amend the plan as many as three times per year, *see* Cal.Govt. Code § 65361 (West Supp.1980).

all land within San Jose, of which Oceanic's property is a relatively small part. Nor can it be said that the designation of land historically and uninterruptedly used consistently with the open space policies was not reasonably related to the legislative goal.

The present inquiry is limited to the question whether the policies embodied in the plan operate to leave Oceanic with such minimal uses as to amount to a taking.

It should be noted that this question is distinct from the issue of whether the entire set of official City actions and enactments, and the

resulting "regulatory condition," is confiscatory. When Oceanic complains of the inadequacy of the "permissible" uses, it must perforce challenge the plan itself, for the plan is the sole claimed source of the limitation to those uses. When it challenges the "regulatory condition," on the other hand, it maintains that even those uses will not, at some hypothetical future time, be allowed; that challenge has already been addressed.

**22.** See note 20, *supra*.

Moreover, even if a challenge to the City's general planning activities (in the form of the general plan) is entertainable, Oceanic's desires for a "favorable return" on the uses permitted fall within the Court's observation in *Andrus v. Allard, supra,* that:

Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform. Further, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property–related interests.

444 U.S. at 66, 100 S.Ct. at 327.

 Oceanic may continue to engage in the present use of the land for a golf course. It may make recreational use of the land, fence it off, or charge admission for such use, *see id.* Even if the plan is not amended, these uses are within the presently existing planning policy of the City. That policy even encompasses the asserted "highest use" of the land: residential development. As in *Haas,* the complaint here resolves to dissatisfaction with asserted limitations on the *scale* of that use. In sum, Oceanic's challenge to what it terms the permissible uses under the plan calls for "reasoned speculation" concerning future economic returns, with no accompanying incursion upon the present uses of the land. The court concludes that no taking claim may be predicated upon such a foundation.

However, Oceanic juxtaposes the allegations concerning the general plan designations with others asserting that the City denied extension of "urban services," specifically sewer lines, to the property. Two distinct purposes are sought to be advanced by these latter allegations. First, Oceanic argues that they support the claim that the City has deprived Oceanic of all reasonable use of the land. Second, it is asserted that the taxes and assessments Oceanic allegedly paid "for" the sewer lines have been unconstitutionally taken "under false pretenses" and should therefore be returned.

For both purposes, argument centers on a decision of the California Supreme Court, *Furey v. City of Sacramento,* 24 Cal.3d 862, 157 Cal.Rptr. 684, 598 P.2d 844 *appeal dismissed and cert. denied sub nom. Webber v. Sacramento,* 444 U.S. 976, 100 S.Ct. 476, 62 L.Ed.2d 403 (1979). The court next turns to discussion of that case and the arguments based upon it.

IV

*Denial of sewer extension*

The *Furey* case involved the formation of a special assessment district for the financing of sewers which were eventually constructed; the plaintiff landowners there provided over one–third of the amount used to build the sewer system. Additionally, the landowners complained of an open space element of Sacramento's general plan and of the agricultural zoning under which the property was classified; the historical use of the land was agricultural. Plaintiffs set forth several theories of relief, including inverse condemnation claims, premised on the diminution in value of their land as a result of the open space element and zoning ordinance, and also premised on the allegation that they had been deprived of the "special benefit" for which they had paid specifically earmarked funds. In other words, they were disabled from using the completed sewer system because their land had been restricted to agricultural use alone, a use which could not possibly benefit from the sewer lines.

The court held that because "[i]t cannot be said that agricultural use of lands long devoted to that purpose is other than a reasonable use," 24 Cal.3d at 872, 157 Cal. Rptr. at 689, 598 P.2d at 849, plaintiffs were not entitled to damages, declaratory relief, or mandate by reason of their inverse condemnation claim founded on the land use restrictions. However, the court also held that declaratory relief or mandate precluding the application of the land–use regulations to plaintiffs might be available based on the operation of the regulations to deprive them of the "special benefit" for which they had paid, i. e. the use of the sewer system.

978

Thus it is clear that the *Furey* case is of no utility to Oceanic as support for its first through third claims for relief. Here, as in *Furey*, the historic uses of the property have remained unaltered. It is true that there is dictum in the case which points broadly in the direction which Oceanic wishes this court to take, but the language in question narrows in the end to circumstances simply not present here.

The relevant portion of the opinion is as follows:

> If the facts herein are demonstrated at trial to be as alleged in the complaints, we are faced with a situation in which local government bodies, pursuing with commendable zeal the philosophy and purposes of one decade, have set into motion the machinery of public improvement in such a manner as to involve a relatively small number of property owners in the total financing thereof, only to reverse their field in the following decade and, pursuing with equal zeal the perhaps more enlightened philosophy and purposes of that later time, remove from some of those owners the ability to effectively utilize the improvement so created. Although as we have pointed out the need for government flexibility to meet the needs and requirements of each emerging generation precludes fulfilling, in all but the most extreme cases, the expectations of value brought about by earlier official moods and actions, we think that entirely different considerations must govern when those moods and actions have operated to bring about substantial financial commitment on the part of taxpayers included in a special assessment district who are precluded by later governmental action from realizing substantially all special benefits generated by the district.

24 Cal.3d at 872–73, 157 Cal.Rptr. at 690, 598 P.2d at 850. The legal basis for the avenue of relief left open in *Furey* is not specified in the opinion. Plaintiffs used an estoppel theory, as well as taking theories based on both the United States and California constitutions. This court shall assume nevertheless that the decision represents a cognizable application of the Fifth and Fourteenth Amendments. Even on that assumption, however, the conclusion does not follow that Oceanic's complaint brings it within the factual setting giving rise to the *Furey* theory of relief.

■ As explained, the complaint herein does not set forth grounds arguably generating "expectations" on which Oceanic is entitled to rely in asserting some vested entitlement to the specific type of development it desires. More particularly, however, there was no special assessment district alleged or formed. As Exhibit D demonstrates, Oceanic paid only general real estate taxes on its property. The sewer system in question was never constructed at all. Thus, there are no "special benefits" for which Oceanic may be said to have paid. In short, Oceanic asserts that it is entitled to "special benefits" which do not exist, for the purpose of serving a development in which it has no vested right. *See Avco Community Developers, Inc. v. South Coast Regional Commission*, 17 Cal.3d 785, 132 Cal.Rptr. 386, 553 P.2d 546 (1976), *cert. denied*, 429 U.S. 1083, 97 S.Ct. 1089, 51 L.Ed.2d 529 (1978).

The fourth claim for relief presents a slightly different theory. Oceanic there seeks damages in inverse condemnation for the amounts of assessments and taxes it has paid. To assert, as Oceanic does, that it has paid assessments "in contemplation of" development of the property, and for the "express purpose" of building public improvements, is not sufficient to salvage an otherwise insufficient inverse condemnation claim. Absent the existence of a special assessment district or of existing facilities paid for out of special district funds and unusable by Oceanic, the fourth claim for relief simply does not come within the narrow confines of *Furey*.[23]

**23.** The court takes note also of existing remedies for excessive assessments under California law. *See Stenocord Corp. v. City and County of San Francisco*, 2 Cal.3d 984, 987, 88 Cal. Rptr. 166, 471 P.2d 966 (1975), *Roth v. City of Los Angeles*, 53 Cal.App.3d 679, 686, 126 Cal.

The second and third claims for relief, seeking declaratory and mandatory relief, respectively, are premised on the existence of a taking. Having concluded that Oceanic has not stated a claim that the City's actions with respect to the property were violative of the Fifth and Fourteenth Amendments, the court must dismiss the second and third claims for relief as well as the first.

IT IS HEREBY ORDERED that defendant's motion to abstain is denied.

IT IS FURTHER ORDERED that the herein complaint is dismissed with prejudice.

Rptr. 163 (1970). Oceanic's complaint neither alleges nor suggests that it has attempted to utilize those remedies.

Moreover, *Furey* itself accorded no monetary relief whatever, including the type sought by the fourth claim in this case; reimbursement of the amounts paid.